IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MONTE-CARLO COUNTRY CLUB and SOCIÉTÉ MONÉGASQUE POUR L'EXPLOITATION DU TOURNOI DE TENNIS, | : : : : | Civil Action No. 07-_____ |
| Plaintiffs, | : : | |
| - against - | : : | |
| ATP TOUR, INC., ETIENNE DE VILLIERS, and CHARLES PASARELL, | : : | **JURY TRIAL DEMANDED** |
| Defendants. | : : | |

## COMPLAINT

Plaintiffs Monte-Carlo Country Club and Société Monégasque pour

L'Exploitation du Tournoi de Tennis ("SMETT") (collectively, "Monte-Carlo"), by their

undersigned attorneys, Sidley Austin LLP and Potter Anderson & Corroon LLP, as and for

Monte-Carlo's Complaint allege as follows:

### NATURE OF THE ACTION

1.      In this action for injunctive, declaratory, and monetary relief, Monte-Carlo

seeks to prevent defendants from implementing an unlawful scheme that would radically restrain

and eliminate competition, reduce output, and raise prices for consumers in various markets

related to the production and staging of professional men's tennis tournaments, in violation of

the federal antitrust laws and state common law.

2.      Defendant ATP Tour, Inc. ("ATP") is a Delaware non-profit membership

corporation of tennis tournaments and players that purports to govern the world of professional

men's tennis by sanctioning, scheduling, and setting standards for professional tournaments other

than the four "Grand Slam" tournaments (Wimbledon, the U.S. Open, the French Open, and the Australian Open). The ATP and certain of its members, officers, and directors are horizontal competitors that have conspired and agreed to implement a new plan that, unless enjoined, will limit output in the relevant markets by reducing the number of top-tier professional men's tennis tournaments; restrain competition among tournaments for the services of top tennis players by imposing mandatory player restrictions and penalties that effectively eliminate players' ability to participate in tournaments excluded from the unlawful cartel; fix prices by capping the amount of prize money and other compensation that certain tournaments may offer to compete for the services of top players; boycott potential competitors by collectively refusing to deal with qualified tournaments that do not meet or abide by the terms of the cartel's unlawful scheme; divide markets for tournaments by manipulating tournament schedules with respect to geographic location and calendar dates, and awarding top-tier tournament sanctions without regard to competitive merit; and impose other rules and policies that will restrain trade and enhance the ATP's monopoly power in the markets related to professional men's tennis tournaments. These anticompetitive actions have the purpose and will have the effect of enriching members of the Brave New World cartel and the ATP itself, at the expense of other market participants and consumers.

3.    With unintended but revealing irony, defendants have named their unlawful scheme the "Brave New World," after the title of Aldous Huxley's dystopian novel of a totalitarian future society. Indeed, far from promoting competition and the good of the sport, this Brave New World would impose on the tennis world the ATP's nightmarish vision of a new world order in which competition against the ATP and its favored tournaments, and competition

between and among the favored tournaments in the cartel themselves, simply would not be permitted.

      4.    This scheme to restrain trade will cause harm to every aspect of professional men's tennis. Unless it is enjoined and declared illegal, the Brave New World will harm consumers by reducing the number of top-tier tournaments they otherwise could have attended or watched. It will harm players by restricting the number of top-tier tournaments in which they can participate while capping the amount of prize money and other compensation that players otherwise could have earned if tournaments at all tiers of competition had to compete against each other in terms of the prize money and other inducements they use to attract players. It will harm media outlets and sponsors by decreasing the number of top-tier tournaments available for broadcasting or sponsorship while restricting their ability to obtain the rights to broadcast or affiliate with other potentially competitive tournaments. And it will harm the organizers of top-tier tennis tournaments – including Monte-Carlo – by preventing them from competing fairly for top players, fans, sponsors, and media coverage, by reducing the number of sanctioned top-tier tournaments, and by awarding top-tier sanctions only to those favored tournaments willing to maintain and expand the cartel's monopoly.

      5.    The Brave New World plan to reduce the number of sanctioned top-tier tournaments and compel participation by all top players in those tournaments will enable cartel members and the ATP to earn supra-competitive profits by restricting competition, controlling the availability of professional tennis players, and increasing the prices of sponsoring, broadcasting, participating, and watching professional men's tennis. Tournaments that are downgraded or excluded from the Brave New World, including Monte-Carlo, will be relegated to a second-tier or lower status and deprived of the means to compete fairly with the new

3

"Masters 1000" tournaments – for top players, premium sponsors, lucrative broadcasting deals, favorable calendar positions, and the broader audience of tennis fans and consumers – as they otherwise would have been able to do in the absence of defendants' anticompetitive scheme.

6.    Indeed, since its founding in 1897, the Monte-Carlo tennis tournament has always ranked as one of the most prestigious tournaments in the world and one of the premier annual events not only in the Principality of Monaco, but in the French Riviera and entire surrounding region. Long before the ATP was even formed, Monte-Carlo established its top-tier status based on competitive merit, by virtue of its stunning location on the Mediterranean sea, its distinguished tradition and history, its exceptional tennis facilities and local amenities for players and spectators, its lucrative prize money and relationships with premium sponsors and media outlets, and its enormous popularity, reputation, and goodwill with tennis players, fans, sponsors, and the media. It has always been one of the crown jewels in professional men's tennis.

7.    But unless defendants' anticompetitive acts are enjoined, Monte-Carlo will suffer imminent, irreparable, and permanent harm, including the loss of a century's worth of accumulated goodwill, prestige, and reputation as a top-tier tournament. It will lose lucrative contracts and business relationships with sponsors, players, broadcasters, and other media outlets, lose significant portions of its audience and market share, and lose the value of substantial investments made over the course of many years to develop and promote the tournament's reputation, facilities, and brand equity. It will also lose significant revenue and profits from ticket sales, licensing, merchandizing, and tourism, along with suffering other damages and losses of future economic opportunities, much of which cannot be quantified to any degree of reasonable certainty.

8.    Yet, if Monte-Carlo could compete on the merits against other tournaments for top players, without the restrictions on output and competition imposed by defendants' scheme, it would continue to thrive in the market and to host its top-tier men's tennis tournament, allowing tennis fans, players, and the market as a whole to benefit from the results of true competition.

9.    Accordingly, Monte-Carlo seeks (i) a declaration that the implementation of the Brave New World would violate the federal antitrust laws and constitute a breach of the fiduciary duties of the individual defendants under state common law; (ii) a permanent injunction restraining the defendants from violating the federal antitrust laws by implementing the Brave New World; (iii) recovery of treble damages for injuries caused by defendants' violations of the federal antitrust laws; and (iv) recovery of compensatory and punitive damages from the individual defendants for breach of their fiduciary duties.

## JURISDICTION AND VENUE

10.    This is a civil action arising under federal and state law.  This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331 (federal question), 1337 (antitrust claims), and 1367 (supplemental jurisdiction), as well as 15 U.S.C. § 26.

11.    Plaintiff's claims and injuries as alleged herein arise from, depend upon, and are inextricably intertwined with the direct, substantial, reasonably foreseeable, and harmful effects of defendants' anticompetitive conduct on domestic trade and commerce in the United States.

12.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 26 and 28 U.S.C. § 1391(b) and (c), and, where applicable, the ATP's Amended and Restated Bylaws (the "Bylaws"), which provide, in relevant part, that "the Delaware Courts [defined as the Chancery

Court of the State of Delaware and the United States District Court for the District of Delaware]

shall have exclusive jurisdiction over any dispute or controversy between [any member] and [the

ATP]."

13.    This Court has personal jurisdiction over defendants Etienne de Villiers

and Charles Pasarell (the "Individual Defendants") pursuant to 10 Del. Code § 3114.

## THE PARTIES

14.    Plaintiff Monte-Carlo Country Club is a non-profit sports association

organized under the laws of France which owns the sanction for what is currently known as the

ATP Masters Series Monte-Carlo professional men's tennis tournament.  Plaintiff SMETT is a

company organized under the laws of the Principality of Monaco that manages and operates the

ATP Masters Series Monte-Carlo tennis tournament pursuant to an agreement with the Monte-

Carlo Country Club.

15.    Defendant ATP is a Delaware non-profit membership corporation with its

principal place of business in Ponte Vedra Beach, Florida.  The ATP does business throughout

the United States and within the State of Delaware.

16.    In addition, there are seven current or future ATP-member tournaments

that have solicited or agreed to join the cartel and accept a top-tier sanction under the Brave New

World scheme.  These seven ATP-tournament members are unnamed co-conspirators with the

ATP and Individual Defendants.

17.    Upon information and belief, defendant Etienne de Villiers ("de Villiers")

is a resident of London, England.  De Villiers is the Executive Chairman and/or the President of

the ATP.  De Villiers is a member of the ATP's Board of Directors.

18.    Defendant Charles Pasarell ("Pasarell") is a resident of Rancho Mirage,

California.  Pasarell is a member of the ATP's Board of Directors, elected by the ATP's

tournament class membership. Pasarell is also a tournament director of an ATP-member tournament that has solicited and agreed to join the cartel and accept a top-tier sanction under the Brave New World scheme. Pasarell has a personal financial interest in the tournament he directs.

## STATEMENT OF FACTS

### A.    The History of the Monte-Carlo Tennis Tournament

19.    Monte-Carlo held its first tennis tournament in 1897. The tournament was the first major sporting event held in Monaco, and has contributed ever since then to the fame and reputation of the Principality and surrounding Riviera region as a world-class destination for travel, entertainment, and sport. In 1927, Prince Louis II of Monaco commissioned the construction of the Monte-Carlo Country Club, on the eastern edge of the Principality in the French town of Roquebrune-Cap-Martin, to host the tournament and take advantage of increasing tourism along the Riviera. The club was inaugurated in 1928.

20.    Along with the Monte-Carlo Grand-Prix (which began in 1929), the Monte-Carlo tennis tournament is now the largest sporting event held in Monaco and the surrounding Riviera region each year, and consistently has ranked among the top professional men's tennis tournaments in the world. Throughout the tournament's illustrious history, the best men's players have competed at Monte-Carlo, including such luminaries as Bill Tilden, Bjorn Borg, Ivan Lendl, Jimmy Connors, Boris Becker, Pete Sampras, Rafael Nadal, and Roger Federer. The Monte-Carlo tournament consistently attracts the top players in the world to compete, and is particularly popular with players who are considered "clay-court specialists."

21.    In 2006, in fact, the Monte-Carlo tournament celebrated its 100th edition with an exciting victory in the finals by Rafael Nadal over Roger Federer, a battle between the

two top-ranked players in the world at the time. The 2006 tournament attracted more than

100,000 spectators to Monte-Carlo and millions of television viewers worldwide.

22.    Historically, the Monte-Carlo tournament has belonged to a group of top-

tier tournaments that rank in prestige directly below the four major Grand Slam tournaments.

Monte-Carlo traditionally has been the first top-tier tournament held in Europe in early spring,

during the run-up to the French Open in Paris. Given Monaco's favorable weather, Monte-Carlo

is one of the few European venues that can host a major clay-court tournament in mid-April.

23.    Monte-Carlo typically attracts most of the top "clay-court specialists" on

the tour because it offers relatively high ranking points as a top-tier tournament and an

opportunity for players to build their rankings at the beginning of the clay-court season. Clay-

court and other players like to play Monte-Carlo to begin preparing for the French Open, which

also is played on clay. Many past champions and finalists of the French Open first captured the

title in Monte-Carlo before triumphing on the clay at Roland Garros. Monte-Carlo is especially

popular among European players – many of whom live in Monaco – and also attracts other top

players from around the world who like to compete at Monte-Carlo for its great tradition, prize

money, popularity, and other attractions.

24.    Monte-Carlo thus established its reputation and prestige in the market as a

top-tier men's tennis tournament more than eighty years before the creation of the ATP. It

acquired that status on its competitive merits by skillfully promoting its beautiful weather and

location between the mountains and the Mediterranean sea, by building and maintaining first-

class tennis courts, club facilities, and tournament services, and by offering exceptional local

amenities and accommodations for tennis players and fans that capitalized on Monaco's natural

beauty and glamorous reputation. Monte-Carlo also succeeded by making substantial

investments in the marketing, promotion, and operation of the tournament, and benefited over time from the consistent support of the government, national tennis federation, and people of Monaco.

25.     Throughout the modern era of professional tennis, Monte-Carlo further enhanced its top-tier status by attracting premium corporate sponsors, such as Rolex (the tournament's current presenting sponsor) and BNP Paribas, which have helped to ensure the tournament's financial success and its ability to attract the top players by offering richer prize purses. Monte-Carlo's successful relationships with print, television, and radio media outlets promoted further financial success, audience interest, and publicity for the tournament. As a result, the Monte-Carlo tournament has developed extraordinary popularity and goodwill over time with players, fans, sponsors, and the media, cementing its reputation as a top-tier tournament.

26.     Monte-Carlo's skillful exploitation of its natural resources and competitive advantages thus earned it a place in an elite category of tournaments (generally less than ten in number) that have always stood head and shoulders above the other men's tennis tournaments (except for the Grand Slams). These elite tournaments formed an informal, but well-recognized, class of premier men's tennis events that predated the birth of the ATP by many years. From its inception, the ATP in turn recognized and sought to capitalize upon the success of these elite tournaments for the benefit of men's tennis – and the ATP itself.

27.     In a free and open marketplace, Monte-Carlo would always be able to rely on its history, prestige, goodwill, and competitive acumen to compete on the merits as a top-tier tournament for the best men's professional tennis players, for world-class sponsors and broadcasters, and for tennis fans and viewers around the globe.

**B.    The Formation and Evolution of the ATP**

28.    Until the late 1960s, only amateur tennis players were allowed to compete in the most prestigious men's tennis tournaments. In the late 1960s, an organization known as World Championship Tennis, Inc. ("WCT") began sponsoring a series of men's professional tournaments. As many of the top tennis players turned professional to play in WCT events, most of the existing prestigious tournaments revised their rules to permit entry of professional players in their tournaments. Monte-Carlo first permitted entry of professional players in 1969.

29.    In 1974, the Men's International Professional Tennis Council ("MIPTC") was formed and began to sanction and schedule a circuit of men's professional tournaments, then known as the "Grand Prix." The MIPTC was comprised of three members representing the International Tennis Federation ("ITF"), the regulator of the Grand Slam tournaments, three members representing men's professional tennis players, and three members representing men's professional tennis tournament directors. The WCT, which continued to sponsor a number of tournaments, agreed to obtain MIPTC sanctions for its entire circuit of tournaments. From 1974-77, Monte-Carlo was a WCT-sponsored tournament. From 1978-80, it was a WCT-Grand Prix event.

30.    During the 1980s, the MIPTC became embroiled in a series of litigation concerning the manner in which it purported to govern the sanctioning of men's professional tennis. First, in 1981, the WCT withdrew from the MIPTC and tried to set up a competing independent circuit for 1982. When this attempt failed, the WCT sued the MIPTC for alleged antitrust violations. This case was settled in the fall of 1983, pursuant to a detailed agreement between the WCT and the MIPTC concerning the sanctioning of WCT events.

31.     Later, in 1985, the MIPTC was sued by Volvo, a sponsor of the Grand Prix circuit during 1983 and 1984. After Volvo was replaced as a sponsor in 1985, it claimed that the MIPTC unlawfully prevented it from competing with MIPTC-sanctioned tournaments. In September 1985, IMC and ProServ, two sports management companies that represented players and also owned and produced tennis tournaments, joined the Volvo lawsuit as plaintiffs. Although the case initially was dismissed by the district court, the Court of Appeals for the Second Circuit, in a decision issued on August 30, 1988, reversed the lower court's dismissal of the case. *See Volvo N. Am. Corp. v. Men's Int'l Prof. Tennis Council*, 857 F.2d 55 (2d Cir. 1988). This case ultimately settled, which led, by early 1989, to the formation of ATP Tour, Inc. to replace MIPTC as the purported governing body for men's professional tennis.

32.     Throughout the 1980s, during this period of extensive litigation, Monte-Carlo continued to produce its tournament and maintain its top-tier status within the men's professional tennis world. In 1989, Hamilton Jordan, the ATP's then-recently named Chief Executive Officer, confirmed Monte-Carlo's sanction for the new ATP Tour as a top-tier "Championship Series" tournament, which consisted of nine top-tier tournaments sanctioned by the ATP. On behalf of the ATP, Jordan praised Monte-Carlo as "one of the 'crown jewels' of professional tennis," and acknowledged that the ATP was "proud and grateful to have your tournament occupy a special place in the new ATP Tour."

33.     Beginning in 1994, the ATP began to market the nine Championship Series tournaments, including Monte-Carlo, as the "Super 9 Series." As part of these marketing efforts, the ATP instituted joint television and marketing programs intended to capitalize on the value of these nine top-tier tournaments and strengthen the ATP brand. In late 1998 and early 1999, each of the Super 9 Series tournaments and the ATP entered into a number of agreements

intended to further facilitate the marketing and exploitation of certain media, sponsorship, and other rights relating to the Super 9 Series of tournaments, including Monte-Carlo.

34.     To that end, in Section 2.6 of the Super 9 Rights Agreement, the ATP and the nine top-tier tournaments expressly contemplated the addition of a tenth top-tier men's tournament in Asia, with the goal of expanding output in the market, enhancing the value of the rights and revenues derived from ATP tournaments, and opening the door to a new audience for premium men's tennis. As set forth below, the potential expansion of top-tier tournaments envisioned by the Super 9 Rights Agreement has not come to pass.

35.     The original Super 9 Agreements have been superseded by later agreements executed in 2004 and 2006. But the ATP has continued to be a party to pooling arrangements with and among the nine recognized top-tier tournaments, including Monte-Carlo. In 2000, the ATP changed the name of this elite group of tournaments to the "Tennis Masters Series." In 2002, the official title was shortened to the "Tennis Masters." Since 2005, these top-tier tournaments have been designated simply as the "Masters Series."

### C.     The Current ATP Structure

36.     Pursuant to its Bylaws, the ATP's stated purposes are (1) to own, sanction and administer one or more circuits of professional tennis tournaments (but not to own the assets of any individual ATP member); (2) to own one or more tournaments, which are not owned by any ATP member; (3) to develop, promulgate and administer rules, regulations and grievance procedures to ensure the fair and orderly conduct of professional tennis; (4) to promote and further the interests of men's professional tennis players and tournaments; (5) to promote its affiliated charit(ies); (6) to improve the conditions for men's professional tennis players; (7) to improve the status and perception of professional tennis as "a major, world class international sport"; (8) to promote and protect the future of the sport; and (9) to encourage interest in tennis.

37.    The ATP's operations are controlled and managed by a seven-person Board of Directors, which consists of: (i) three representatives of its tournament members (one each from Europe, the Americas, and the rest of the world); (ii) three representatives of its player members (one each from Europe, the Americas, and the rest of the world); and (iii) the Executive Chairman/President of the ATP (defendant de Villiers).

38.    The player representatives on the Board are not elected directly by the players who are members of the ATP. Instead, they are chosen by a "Player Council," which consists of ten voting members chosen from among certain defined categories of players, based upon current entry rankings as established by the ATP.

39.    In purporting to govern men's tennis, the ATP regulates and ranks players, establishes the tennis tournament calendar, and sanctions tournaments in varying tiers below the Grand Slam level. Pursuant to the ATP Rules, players in good standing with the ATP, and ranked within the Top 50 players, are required to execute and deliver a written Commitment Agreement at the end of each year to become eligible for ATP tournaments in the following year. The ATP's player rankings are based on a system of points awarded according to the player's success in the various tiers of ATP tournament competition. A player's ranking determines eligibility for tournaments and the draw where the players will be seeded within the tournaments themselves.

40.    The ATP encourages player participation in the Masters Series through a series of inducements, including bonus pools, which set aside funds contributed by the tournaments to award players who satisfy their Commitment Agreements and accumulate the most ranking points in the process. Technically, the ATP also has the ability to penalize top-ranked players for failing to appear in certain tournaments. However, the current ATP penalty

structure only begins to impose (relatively insignificant) financial penalties once players miss three or more of the Masters Series tournaments. As defendant de Villiers has stated publicly, in reality the ATP does not penalize its players currently for exercising their own choice as to whether or not to participate in particular tournaments.

41.     The ATP currently sanctions, schedules, and sets standards for several circuits of men's professional tennis tournaments other than the Grand Slams, which are governed by the ITF. Pursuant to an agreement between the ITF and ATP, entry into the annual Grand Slams is determined in large part by a player's performance in ATP-controlled events in the twelve months preceding a Grand Slam. The ATP and the ITF also have a joint ownership interest in the ATP's year-end Tennis Masters Cup tournament, which features the top eight players on the tour.

42.     The men's tennis calendar revolves around the four Grand Slams and is largely demarcated by the surface (hard court, clay, or grass) that the tournament is played upon leading up to the Grand Slam events. Factors such as tradition, prestige, geographic proximity to the Grand Slam event, weather, surface conditions, and player and fan facilities traditionally have played key roles in the scheduling and sanctioning of top-tier tournaments.

43.     The ATP currently sanctions four primary categories of men's professional tennis tournaments: (1) the ATP Tennis Masters Cup, a year-end tournament owned in part by the ATP and ITF; (2) the ATP Masters Series, featuring the nine top-tier tournaments (including Monte-Carlo) and offering the highest ranking points and prize money of the regular-season tournaments; (3) the International Series (Gold and Regular), offering an intermediate level of prize money and ATP ranking points; and (4) the Challenger Series, offering the lowest level of prize money and ranking points in a series of more than 100 events around the globe.

44.    Under the 2007 ATP calendar, the following tournaments are sanctioned as Masters Series events:

| Tournament | Date | Purse (U.S. $) | Surface | Continent |
|---|---|---|---|---|
| Indian Wells | March 5 | $3,285,000 | Hard Court | North America |
| Miami | March 19 | $3,450,000 | Hard Court | North America |
| Monte-Carlo | April 16 | $2,450,000 | Clay Court | Europe |
| Rome | May 7 | $2,450,000 | Clay Court | Europe |
| Hamburg | May 14 | $2,450,000 | Clay Court | Europe |
| Canada | August 6 | $2,450,000 | Hard Court | North America |
| Cincinnati | August 13 | $2,450,000 | Hard Court | North America |
| Madrid | October 15 | $2,450,000 | Hard Court (indoor) | Europe |
| Paris | October 29 | $2,450,000 | Carpet (indoor) | Europe |

45.    At the end of the season, the top eight players according to results in the Grand Slam and the Masters Series tournaments are selected to play in the Tennis Masters Cup.

46.    The ATP limits a player's ability to appear in non-ATP tennis tournaments, which are called "special events" under the ATP Rules. For example, the Rules preclude a player from playing in a non-ATP "special event" that is scheduled within the calendar period of any ATP Masters Series tournament, International Series Gold tournament, Tennis Masters Cup, or ATP World Doubles Championship, or within 30 days before or after such an ATP event if the "special event" is within a hundred miles of such ATP event or within the same market as that event. Other portions of the special events rules impose similar restrictions around ATP International Series Tournaments and other ATP events. Given the

15

control the ATP exerts over the calendar for its sanctioned events, these rules make it virtually

impossible for any independent tournament to attract enough top players to produce a top-tier

tennis tournament within the traditional tennis season.

**D.    The Brave New World**

47.    In June 2005, the ATP appointed defendant de Villiers, a former executive

at Walt Disney International Europe, to serve as the non-executive chairman to replace the

outgoing chief executive officer ("CEO") of the ATP.  Although the ATP planned to hire both a

new chairman and a CEO with specialized tennis-related knowledge and experience to assume

the broad governance responsibilities held by its previous CEO, de Villiers soon consolidated

control and governance responsibilities into a single position of executive chairman/president.

He was appointed to that new post in January 2006.

48.    As early as October 2005, de Villiers and members of the ATP

management began discussing a restructuring plan, including a "thorough evaluation of the

tennis calendar" and a "new strategy for the sport's season."  De Villiers believed that, "if we are

to change and grow, by definition the status quo has to be disturbed.  That means some people

will be happier with some losers in the short term.  Hopefully, we will collectively come out

better, much better and that's the whole idea."  Later, de Villiers remarked in the press that "if

both sides are feeling the pain, then we're going in the right direction."

49.    Although studies by ATP's consultants would later confirm that the

current tournament structure has produced a "healthy, profitable and growing tour," de Villiers

embarked on a plan to generate supracompetitive profits by reducing output, restricting

competition, and increasing the ATP's monopoly power over the sanctioning of tournaments, the

control of professional players, and the marketing and sale of broadcast and other rights to ATP

tournaments.

50.    By January 2006, in fact, de Villiers had decided that a smaller group of top-tier tournaments would "come out better, much better" by "downgrading" the status of certain other tournaments, and appropriating the value built up by those tournaments over time. Under a plan he now called the "Brave New World," de Villiers believed, without consulting the "losing" tournaments involved, that he could buy their cooperation by compensating them with a portion of the increased profits that the "winning" tournaments stood to gain from reducing the overall number of top tournaments. According to de Villiers: "Some [tournaments] will suffer, some will lose, but we will be fair and reasonable in compensating those in order to achieve what's best overall."

51.    By April 2006, de Villiers had determined that his Brave New World would not require the restructuring of any North-American-based tournaments in the January-March or July- September segments of the annual tour calendar. The plan would focus instead on "the clay-court season prior to Roland Garros" in the spring, when Monte-Carlo's tournament is held, "and the autumn season prior to the Tennis Masters Cup circuit finale."

52.    In June 2006, the ATP Board of Directors decided to implement the Brave New World "future format" in 2009, rather than 2008, and directed management to continue developing the details necessary for implementation. The Board discussed the "required player commitment for the 2009 format" and reached a "consensus that the format should apply to 'premium players' comprised of top ranked players and selected marquee players," who would be "required to play six of eight Masters events and three of eight events comprising the next tier of tournaments." Under this version of the plan, all premium players "would be required to play in each of the Masters events over a two-year period."

53.    At a meeting in New York City in August 2006, the ATP Board agreed with de Villier's earlier recommendation that the "winners" in the Brave New World should provide "compensation" for the value taken from the "downgraded" tournaments. The Board reached a consensus to "provide compensation for tournaments that are downgraded to be funded by financial contributions from tournaments that are upgraded."

54.    At a General Tournament Meeting in August 2006, de Villiers revealed a proposed calendar creating a "swing based virtual premium tour" showing a "Road to Roland Garros" in the spring clay-court season featuring only one European Masters and one European Masters Combined tournament, as well as a "Race to Tennis Masters Cup" featuring one China Masters Combined and one European Indoor Masters. Thus, de Villiers had decided to reduce the number of European top-tier clay tournaments from three to two.

55.    Under this version of the plan, the 2009 player commitment for the Masters category would require "premium players" to play six of eight Masters each year and all eight Masters every two years. A new system of penalties for missing one of the "committed/designated events" would include zero points for ranking purposes for the missed event and suspension for the next Masters event entered, unless the player "goes on site and performs meaningful promotional work at the event" missed. The model would also include "significant financial sticks" for missing a designated event, including "bonus rebates" of 50% for one missed event, and 100% for two missed events.

56.    In response to this plan, the European tournament directors informed de Villiers in September 2006 that they were unanimously opposed to the plan to reduce the number of European clay-court Masters tournaments and that they were ready to take legal action against the ATP to restrain the plan from being implemented. De Villiers responded by reiterating the

plan to compensate any tournament that was downgraded. As to the potential legal action, de Villiers stated simply: "our insurers have been advised."

57.     By October 2006, de Villiers issued "ATP Message Points" indicating that the mandatory "six of eight" Masters requirement for premium players may be increased to "8-of-8," thus making it far more difficult for downgraded or lower-tier tournaments to compete against top-tier events to attract top-ranked players. On November 12, 2006, the Board agreed that "the player commitment for 2009 Masters tournaments should be eight of eight."

58.     At an ATP Tournament Directors meeting in November 2006, de Villiers explained that the Brave New World plan would establish three tiers of sanctions for professional tournaments below the Grand Slam level: the ATP Masters 1000, the ATP Open 500, and the ATP 250. Post-restructuring, there would be only eight Masters 1,000 tournaments (four in North America, three in Europe, and one in Asia), at least fifteen "Open" 500 tournaments, and approximately thirty-nine ATP 250 tournaments. The numbers associated with each sanction (1000, 500, 250) correspond to the number of ATP ranking points that would be available to players who compete in those events.

59.     The November presentation confirmed that players' participation would be mandatory in all eight Masters 1000 tournaments, with the results of all eight tournaments counting toward player rankings. This player commitment strategy would be enforced by a system of "carrots and sticks," including an increased bonus pool and greater prize money on the one hand, with strict sanctions for missing any of the mandatory Masters 1000 tournaments on the other, including loss of accumulated bonus money, withdrawal fines, "zero pointers" for ranking purposes, and suspensions from subsequent Masters tournaments.

60. By contrast, players would be required to play only four of fifteen Open 500 tournaments, and only the best four results from play in Open 500 tournaments would count for ranking purposes. And while Masters 1000 tournaments would feature "all of the Top 10 players," the Open 500 tournaments would only "feature on average 3 out of the Top 10 players."

61. De Villiers' presentation in November 2006 reported that his Brave New World plan to reduce output and restrict competition would "achieve at least 20% growth in revenues!" But because that "growth" would come at the expense of downgraded tournaments to reduce the level of top-tier competition, rather than from any type of increased efficiencies, de Villiers emphasized that "[f]urther Board discussions" would be needed to address "compensation structure for upgrades/downgrades" in the Brave New World.

62. In a November 2006 financial review commissioned by the ATP to examine the potential financial impact of the Brave New World on existing tournaments, an ATP consultant reported that some "changes in status will be required of specific tournaments, and a separate 'applications/bidding process' to manage this transition is being developed by ATP."

63. It quickly became clear, however, that the "applications/bidding process" designed to manage the reduction in output would not be based on the competitive merits of the tournaments applying for Masters 1000 sanctions, but on other factors designed to enrich the ATP and the favored tournaments in the Brave New World cartel, including large financial payments from certain selected tournaments. It also became crystal clear that the ATP intended to downgrade Monte-Carlo and Hamburg from their current top-tier status – even before any applications had been submitted.

64.    In fact, in an agenda prepared for the ATP Board meeting in November 2006, de Villiers made it clear that he had already predetermined which tournaments would be downgraded. The presentation listed fifteen "Probable" ATP Open 500 category tournaments, including Monte-Carlo and Hamburg as "downgrades." A discussion of prize money and ranking point levels for Open 500 tournaments listed "monte carlo [*sic*]" as an Open 500 tournament, and described a "phased approach" indicating that in 2009 "Monte-Carlo may become Open," rather than a Masters 1000 tournament. None of the other Masters Series tournaments was listed as a potential "downgrade."

65.    In early January 2007, the European Tournament Members wrote a letter to de Villiers expressing their serious objections to implementing the Brave New World. The letter was sent by Zeljko Franulovic, the Tournament Director for the Monte-Carlo Tournament, who had been elected to serve as the ATP Board Representative for the European Tournament Members, effective January 1, 2007. At Franulovic's first ATP Board meeting in Melbourne, Australia, on January 17, 2007, he was forced to leave the meeting while de Villiers and the other individual defendants discussed the European Tournaments' protest letter.

66.    On January 18, 2007, the Board voted to approve the Brave New World format and calendar for 2009. Franulovic voted against the plan, but to no avail.

67.    Minutes of the meeting confirm that the Board agreed that the "number of Masters Events [is] to be reduced from 9 to 8" in the Brave New World. Two new "Combined" men's and women's Masters Events would be added, including one hard-court event in China to follow the U.S. Open, and one clay-court event in the spring two weeks before Roland Garros.

68.    The Board approved the mandatory player commitment plan in which "[a]ll eligible players will be required to play 8 of 8" Masters 1000 events in the Brave New

World. The approved plan includes strict penalties (zero ranking points, bonus point reductions,

suspensions from future Masters 1000 events) for failing to play all eight mandatory Masters

1000 events:

> All direct acceptance players at the time of the entry deadline who
> do not play will receive a zero pointer in their ranking. In addition
> players who do not play and do not attend the event and perform
> promotional activities over a 1 day period will forfeit 50% of ATP
> bonus received and will be suspended for the next highest point
> earned Masters 1,000 event within the next 12 months.
> Subsequent Masters 1,000 withdrawals will have cumulative
> suspensions (i.e. 2nd Masters 1,000 withdrawal will result in a
> suspension of 2 tournaments, as per above). To regain good
> standing status, player needs to fulfill his commitment in the next
> 16 consecutive Masters 1,000. . . .

69.    The Board further approved a "[s]ignificant Player Bonus pool to be

funded from tournament financial commitment and ATP."

70.    Under the new player ranking system approved by the Board, a player's

ranking "will consist of results from 4 Grand Slam events, 8 [Masters 1000] events, best 4 Open

500 results and best 2 International Series results. Winners points will be 2,000 for Grand

Slams, 1,000 for [Masters 1000] events, 500 for Open 500 events and 250 for International

Series events."

71.    The Board also approved "category protection" to guarantee Masters 1000

status to the "successful applicants" for a ten-year period:

> Successful tournament member applicants for the two new
> Combined Masters 1,000 events will be granted category change
> protection, in exchange for individual non-compete agreements
> consistent with past ATP practice, for a 10-year period subject to
> compliance with ATP rules, bylaws, minimum standards, and
> conditions specified in the completed application. Fees TBD
>
> [Masters 1000] tournament members in 2009 who don't currently
> have contractual category change protection will be offered
> category change protection, in exchange for individual non-
> compete agreements consistent with past ATP practice, for a 10-

year period, subject to compliance with ATP rules, bylaws, and minimum standards.

72.     In addition, the Board "agreed that the Chinese sanction would be subject to a matter of negotiation and not an open application." Certain other candidates for Masters 1000 sanctions would be required to submit to a so-called "open application" process.

73.     If implemented, these and other elements of the Brave New World would drastically change the face of competition among top-tier tennis tournaments by:

    (a)    Reducing the total number of top-sanctioned Masters 1000 tournaments from nine to eight, adding one new Masters 1000 tournament in China, while downgrading two of the current total of five top-tier European tournaments to the Open 500 level;

    (b)    Imposing a mandatory system of restrictions and penalties obligating all eligible top players to participate in all eight Masters 1000 tournaments, and counting points from all eight for ranking purposes, with penalties for failure to participate to include loss of ranking points, reduction of bonus pool money, and suspension from future Masters 1000 events;

    (c)    Capping the amount of prize money and other compensation that lower-tier tournaments may offer to players to bid for their services, while obligating top players to participate in only four of a possible fifteen second-tier Open 500 events, with points from only the best four tournaments counting towards a player's ranking;

    (d)    Awarding a top-tier Masters 1000 sanction to the new tournament in China based on a large financial pay-off to the ATP rather than an open application process, and allocating the remaining seven Masters 1000

sanctions to favored tournaments without a truly competitive bidding process (because some of those favored tournaments do not have to make a bid of any kind and the ATP has predetermined which tournaments will be downgraded);

(e)    Manipulating the tournament schedule to award prime calendar dates to the eight top-tier Masters 1000 tournaments, while shielding those favored tournaments from calendar competition from lower-tier tournaments, and realigning lower-tier tournaments to less-desirable calendar dates;

(f)    Pooling the broadcast rights to top-tier Masters 1000 tournaments through ATP Media, to obtain higher profits from the sale of those rights and enrich the ATP itself;

(g)    Boycotting potential competitors and collectively refusing to deal with downgraded and other tournaments that refuse to participate in or abide by the rules of the Brave New World cartel.

**E.    The Brave New World Sanction "Selection" Process**

74.    Although the ATP still has not disclosed all of the final details of the Brave New World, tournaments (other than the China Masters 1000 and certain North American tournaments) were required to file applications for the reduced number of top-tier Masters 1000 sanctions by March 16, 2007. The application materials claim that there will be a two-step selection process, in which applicants will be evaluated first on the minimum criteria described in the sanction applications, and then on the amount of financial payments a tournament is willing to make to the ATP itself to obtain one of the limited, top-tier sanctions. The ATP Board is scheduled to vote on the "selection" of the favored tournaments on or about April 25, 2007.

75.    Although de Villiers and the ATP repeatedly have claimed that the selection process will be "open and transparent," that process is a sham.  The ATP has already predetermined the winners and losers of the process.  And the predetermined results are not based on the competitive merits of the respective tournaments.

76.    As alleged above, ATP documents from November 2006 already show that Monte-Carlo and Hamburg will be downgraded.  The ATP has circulated a proposed calendar for the 2009 season that already lists Monte-Carlo as an Open 500 Tournament.

77.    Other documents developing the strategy for Open 500 tournaments confirm that – even before completion of the Masters 1000 application process – Monte-Carlo and Hamburg were pre-selected for downgrading.

78.    In a revised proposal for Open 500 tournaments in February 2007, for example, the ATP designated both Monte-Carlo and Hamburg as Open 500 tournaments.  Although this document suggests that the tournaments named as Open 500 events are "for orientational purposes only," and that actual, final tournaments will be determined "following application process!", it is obvious that Monte-Carlo and Hamburg will be downgraded.  Monte Carlo and Hamburg are the only two Masters Series tournaments identified in this document or *any* of the ATP's documents as Open 500 tournaments; none of the other Masters Series tournaments is mentioned even "hypothetically" as a candidate for downgraded status.

79.    Indeed, at the recent ATP Board meeting in Miami in March 2007, an ATP presentation again listed both Hamburg and Monte Carlo as "likely/potential" Open 500 tournaments, even though the application deadline for the selection process for the Masters 1000 tournaments had not yet been announced.  None of the other applicants for the Masters 1000 series was listed as a potential downgrade candidate in that presentation.  The document also

indicated that the ATP now plans to further restrict competition at the Open 500 level by reducing the number of tournaments in that tier from fifteen to eleven, and to further restrict the ability of ATP 250 tournaments to compete by, among other things, capping the number of top players that would be permitted to play in certain of those tournaments.

80.    In addition, the ATP Board voted on March 27, 2007 to award a Masters 1000 sanction to tournament organizers in Shanghai, China. This sanction was given to the Shanghai tournament in exchange for a massive financial payment to the ATP, and not based on the Shanghai tournament's relative competitive merits in comparison to other candidates for the Masters 1000 sanctions. Indeed, the Shanghai tournament would not be able to compete for top-tier status at this time but for the Brave New World scheme, because most of the top tennis players would not choose to travel to Asia for such an event in the absence of the mandatory player restrictions and penalties that will be implemented in the Brave New World. Many of the anticompetitive features of the Brave New World, including the decision to downgrade Monte-Carlo and Hamburg and to compel players to play all eight of eight Masters 1000 events, are designed to prop-up the status of the China event – in exchange for a huge financial payment to the ATP – as a top-tier tournament.

81.    Significantly, the ATP and certain ATP officers, including defendant de Villiers, stand to gain financially if the anticompetitive Brave New World is implemented. In addition to the large financial payment "negotiated" from the Shanghai tournament in exchange for selecting it to receive one of the new Masters 1000 sanctions, the ATP will receive a higher sanctioning fee from Shanghai and marketing payments from the chosen cartel tournaments, increased revenue from its portion of pooled television rights and sponsorship rights related to the Masters 1000 series, new fee income from ATP branding rights, and higher profits from the

enhanced status of the ATP-owned Tennis Masters Cup at the end of the season. Upon information and belief, certain ATP officers, including defendant de Villiers, will receive bonuses linked to ATP revenue growth derived from payments received from the favored tournaments – including the Asia Masters 1000 in China – that have already been selected as top-tier Masters 1000 tournaments. Upon information and belief, the ATP officers' bonuses, including that of defendant de Villiers, may be further supplemented by enhanced television revenues to be derived under the Brave New World television pooling arrangement, after tournament output has been reduced and competition from other tournaments eliminated.

82. Furthermore, upon information and belief, defendant Pasarell stands to personally profit if the anticompetitive Brave New World is implemented. Pasarell has personal financial interests in one of the favored cartel member Masters 1000 tournaments. As this tournament stands to receive supracompetitive profits if Brave New World is implemented, upon information and belief, Pasarell will receive substantial personal financial benefits from the implementation of defendants' illegal plan. The personal benefits to be received by defendant Pasarell will not be not shared equally with the members of the ATP.

**F.    Opposition to the Brave New World**

83. Even before applications for the sham application process were due to be submitted, the ATP confirmed its intention to downgrade Monte-Carlo and Hamburg by offering to pay both tournaments millions of dollars in "compensation" if they would accept their downgraded status and join the anticompetitive Brave New World. Both tournaments rejected those offers.

84. Monte-Carlo has made it clear to the ATP that it will not accept any monetary payments because it prefers instead to be free to compete with the ATP or anyone else to present a top-tier tournament. Monte-Carlo is confident that, if permitted to compete, it would

successfully remain the top-tier event it has been for more than 100 years. In Monte-Carlo's view, the money offered by the ATP could never fully compensate it for the loss of status, reputation, goodwill, and other harms it will incur if the Brave New World is implemented.

85.    Because the ATP rejected Monte-Carlo's efforts to prevent implementation of the Brave New World, Monte Carlo was left with no alternative but to submit an application for a Masters 1000 sanction, under protest, in order to preserve all of its rights while seeking court intervention. The Hamburg tournament also submitted an application under protest.

86.    As information about the anticompetitive nature of the ATP's plan to implement the Brave New World has come to light, the plan has been criticized and opposed by other important constituents in the world of tennis. Players who have learned about the predetermined results have complained that, if implemented, the Brave New World will inflict serious harm on the sport. According to a press interview of Rafael Nadal at the Indian Wells tournament in early March, many players are "unhappy" and "aghast" at the ATP scheme and do not want Monte-Carlo to lose its top tier-status:

> This was not really the occasion for tennis chitchat, but Nadal has something on his mind that it was difficult to resist mentioning. There had been a meeting of more than 20 players here in the past few days, most of whom might have the phrase "clay-court specialist" attached to their names, who are aghast at proposals emanating from the ATP about changes to the calendar for next year and beyond that will have a serious impact on the season.
>
> Nadal could not be described as a ringleader, but he is the most prominent of those who do not want to see Monte Carlo or Hamburg lose their Masters status, as is suggested, who do not think that four back-to-back events in the spring of 2008 — a concertina effect caused by calendar shifts — is fair and want a significant say in helping to shape the future of the tour. They are talking to the European tournament directors, especially that of Monte Carlo (an event Nadal holds in the deepest esteem) who are

unnerved at losing the status that they have fought long and hard to
build.

"A lot of the clay-court players are unhappy," Nadal said. "We
have more players to talk to and we will see what we can do. It is a
very important part of the season for so many players and the
tournaments in Europe are the very best."

Roger Harman, *A Drive With Rafa Reveals Man on Mission of Resistance*, The Times (UK)

Online (Mar. 13, 2007).

87.    On March 20, at a player's meeting with de Villiers at the Masters Series

tournament in Miami, Florida, players presented de Villiers with a letter, signed or authorized by

more than sixty of the top players, including Nadal, Federer, and Andy Roddick, complaining

about changes in the Brave New World that "we had not been informed of and that we

unanimously disagree on." The first of the major "UNACCEPTABLE ISSUES" for these

players is the plan to downgrade Monte-Carlo and Hamburg: "We all completely disagree on a

downgrade of the status of one of the World's top class event and two of the events giving more

ATP points in the ATP circuit." The players objected that the downgrading of those two

tournaments will result in "[l]ess clay tournaments and points," leading to loss of "8% of points

on clay" on the tour.

88.    Significantly, the letter stated that "the players signing this document have

not been represented by Board Members. We are not being consulted or even informed and

therefore do not consider legitimate any decisions taken with regards to the ATP 2008 & 2009

calendars." The players "strongly demand[ed] that the proposed calendar change do not move

forward." In the "Chairman's Report" of the same meeting, defendant de Villiers was forced to

admit, "We were criticised on a number of fronts during the past two weeks . . . We got heavily

criticized by the players at the general meeting for recategorizing two clay Masters tournaments,

potentially Hamburg and Monte Carlo."

89.    In addition to the players, at least one current Masters Series event not targeted for downgrading has also objected to the anticompetitive nature of the Brave New World. On March 22, the sponsoring organization for that tournament wrote to the ATP, stating that it had not participated in the creation or planning of the Brave New World and that it believed the Brave New World violated the antitrust laws in a number of respects.

90.    And on March 29, 2007, the Hamburg tournament filed a complaint in this Court against the ATP and the ATP Defendants alleging, among other things, that the Brave New World violated Sections 1 and 2 of the Sherman Act and various state fiduciary duty laws. *See Duetscher Tennis Bund (German Tennis Federation) and Rothembaum Sports GmbH v. ATP Tour, Inc., et. al.*, Civ. No. 07-178 (D. Del.).

91.    Despite such strong opposition from players and many tournaments, the ATP and the other defendants apparently intend to proceed with the implementation of their anticompetitive and unlawful scheme unless enjoined by this Court. As de Villiers defiantly announced to the press recently, "I am going to see this thing through" and "at the end of the day, I have to listen to my own voice." He then noted, "if there are injunctions, then we'll be stopped, but I think that is unlikely." Charles Bricker, *Clay-Court Events Might Lose Some Clout*, Sun-Sentinel.com (April 1, 2007). Injunctive relief, therefore, is the only means of preventing de Villiers and the ATP from implementing this unlawful scheme.

### THE RELEVANT MARKETS

92.    As described above, this action involves the business of producing and staging men's professional tennis tournaments. For antitrust purposes, the relevant product markets include, at a minimum: (1) the market in which men's professional tennis tournaments compete to attract the services of top professional tennis players to participate in their tournaments (the "Players Market"); (2) the market for the provision of sanctions and the setting

and enforcement of standards (including eligibility) for professional men's tennis tournaments (the "Sanctions Market"); (3) the market for the sale of television broadcasting rights to men's professional tennis tournaments (the "TV Market"); and (4) the market for the sale of sponsorship opportunities in connection with men's professional tennis tournaments (the "Sponsorship Market").

93.    The geographic scope of each of these relevant markets is world-wide. The geographic scope of the TV Market may also be regional or national.

## THE ANTICOMPETITIVE CONDUCT
## AND EFFECTS OF THE BRAVE NEW WORLD

94.    As set forth below in detail, the ATP's Brave New World, if implemented, will unreasonably restrain trade and cause substantial harm to competition in the relevant markets. The ATP has market power individually for some purposes, and collectively with some of the cartel tournaments for other purposes, because it is able to control prices, eliminate competition, and exclude new entrants in each of these relevant markets.

95.    For example, the ATP has market power in the Players Market by virtue of its arrangements with the ITF and its unilateral control over player rankings and eligibility requirements for the top 150 professional players. The ATP's player suspension powers and control of qualification for entry into ATP-sanctioned tournaments and the Grand Slams allow the ATP, among other things, to fix prize purses and appearance fees and to set participation requirements in ways that limit competition among tournaments for player participation.

96.    The ATP has market power and creates barriers to entry in the Sanctions Market by virtue of its gatekeeper function over player eligibility requirements and rankings and its unilateral control over the terms and conditions for tournament sanctions at every level. Without an ATP sanction, a tournament organizer cannot obtain access to or attract any of the

top 150 professional tennis players and simply cannot produce or stage a top-tier tennis tournament.

97.    The ATP has market power in the TV Market and Sponsorship Market by virtue of its unilateral control over tournaments in the Sanctions Market and players in Players Market and its ability to limit the number of tournaments at every tier level and centralize sponsorships in the ATP itself.  As such, the ATP can limit competition for television rights and sponsorships and require tournaments to pool and share rights and revenues from television broadcasts and sponsorships with the ATP and other cartel tournaments as a condition of obtaining access to top tennis players and ATP sanctions.

98.    If the Brave New World is implemented, the ATP and its favored tournaments will be able to exercise their market power in these relevant markets to earn supracompetitive profits and eliminate competition by wrongfully reducing output, increasing prices, boycotting downgraded or non-cartel tournaments and players that refuse to comply with the Brave New World order, and dividing and allocating markets among themselves.  The naked restraints on trade to be implemented in the Brave New World are utterly devoid of any redeeming competitive justification.

99.    As set forth below, defendants' actions to restrain trade and monopolize the relevant markets constitute violations of Sections 1 and 2 of the Sherman Act.

**A.    Horizontal Conspiracy and Agreement to Restrict Output:  Decreasing the Number of Top-Tier Tournaments**

100.    The conspiracy and agreement by defendants and the cartel members to reduce the current number of sanctioned top-tier tournaments from nine to eight constitutes an unlawful restriction on output in violation of Section 1 of the Sherman Act.  This decision by horizontal competitors to artificially reduce output by eliminating one top-tier sanction has the

purpose and effect of increasing the value of the remaining Masters 1000 tournaments in the cartel and enriching the ATP itself, while driving up the costs and reducing the value of excluded tournaments by eliminating their ability to compete for top-tier sanctions, attract top players, and obtain premium sponsorships and media revenue and coverage.

101.   Indeed, although the parties to the original Super 9 Rights Agreement had contemplated that output in the relevant market could be expanded by adding a tenth top-tier tournament in China, defendants' conspiracy to add the China tournament as a Masters 1000 event, while simultaneously downgrading the status of two European clay-court tournaments, effectively reduces output in the market from a potential of ten top-tier tournaments to a total of eight.

102.   The Brave New World thus decreases the number of top-tier tournaments and reduces the quality of at least some of the other tournaments, including downgraded tournaments such as Monte-Carlo and Hamburg, for the purpose of increasing the cumulative net revenues of the cartel Masters 1000 tournaments and the ATP's year-end Tennis Masters Cup, and increasing the share of these net revenues that are retained by the ATP itself. The Brave New World thus increases profits by reducing quantity and quality in the face of insurmountable barriers to entry.

103.   As a result, players will have fewer opportunities to compete for higher purses and ranking points at top-tier matches. By losing one top-tier clay-court tournament overall, clay-court specialists in particular will lose an opportunity to build ranking points and prize money on the surface on which they excel, lowering their ability to qualify for the year-end Masters Cup and for the Grand Slams. Tournaments that are downgraded or otherwise excluded from the Masters 1000 level will lose revenue, attendance, sponsorships, and television coverage

and associated rights income, as well as incalculable goodwill and prestige. And tennis fans and spectators will have fewer opportunities to attend or view top-tier tournaments while paying more for the fewer cartel events that are available.

104.    Defendants' naked restrictions on output have no redeeming competitive rationale. The ATP's goal of maximizing profits and increasing revenues for the cartel does not provide any reasonable justification for reducing output in the Brave New World. Indeed, the purported goal of increasing consumer interest in a smaller tier of top tournaments by downgrading and excluding other tournaments from competition is not a reasonable business justification, but rather the perfect description of the adverse effect of an anticompetitive act.

**B.    Horizontal Group Boycott and Concerted Refusal to Deal: Players and Tournaments**

**1.    Group Boycott of Players**

105.    Compounding the contraction of output, the Brave New World would further restrain competition for the services of top tennis players, and increase the ATP's market power over player eligibility requirements and rankings, by mandating that all qualified top-ranked players must compete in eight of eight Masters 1000 tournaments, while imposing draconian penalties for failing to honor those commitments. The purpose and effect of these mandatory commitments and sanctions is to restrict the supply of top players and guarantee that top players participate in all Masters 1000 tournaments in the cartel, at the expense of downgraded and lower-tier tournaments, by drastically limiting players' ability to participate in tournaments outside the cartel. Defendants and the members of the cartel as horizontal competitors have agreed that they will not deal with players except on the terms imposed by the Brave New World, and players who refuse to accept the mandatory commitment terms will not be permitted to participate successfully in professional tennis, if at all.

106.    By means of the draconian player restrictions and sanctions in the Brave New World, defendants and the members of the cartel have agreed to engage in a group boycott or concerted refusal to deal with players who refuse to do business with them on the specified terms. Indeed, defendant de Villiers has admitted that the Brave New World will not give players the option of selecting the number of Masters 1000 tournaments in which to play. According to him, "[t]here are no options for these events, it's eight of eight for the players. If you [a top ranked player] don't show up, you will be fined and suspended."

107.    Under the terms of the Brave New World player boycott, the commitment restraints include incentives and penalties ("carrots" and "sticks") designed to guarantee that the top players compete in all Masters 1000 tournaments sanctioned by the ATP. On the one hand, because players must compete in all eight tournaments to become eligible for the ATP bonus pool, they have less financial incentive to participate in tournaments outside the cartel. Likewise, because the point results from all eight Masters 1000 tournaments count in determining rankings, players are compelled to compete in all eight tournaments to boost their overall rankings in order to obtain more favorable seedings in ATP-sanctioned tournaments, to become eligible for entry to the Grand Slams, and to attract lucrative endorsement deals and sponsorships, which depend in part on high rankings.

108.    But on the more coercive side, players who fail to compete in all eight Masters 1000 tournaments face stiff financial and professional penalties, including the loss of any player bonus accrued, withdrawal fines, "zero pointers" to the players' rankings, and suspensions from subsequent Masters 1000 events. As illustrated below, the practical effect of the Brave New World "sticks" (in comparison to the current system), is to compel top players to compete in the Masters 1000 tournaments to the near exclusion of other tournaments:

|  | **Current System** | **Restructured System** |
|---|---|---|
| Financial Penalties | Yes but only after three absences | Yes immediately |
| Suspension and Exclusion from Future Tournaments | No | Yes |

109.   Under the coercive terms of the Brave New World, players will thus have no choice but to play eight of eight Masters 1000 tournaments under the terms dictated by the ATP, or not play at all.  Failure to comply will result in the cartel's concerted refusal to deal with that player and a corresponding loss of prize money, ranking points, eligibility for subsequent Masters 1000 events, sponsorships and product endorsement deals, and opportunities to advance his career in professional tennis.

### 2.   Group Boycott of Tournaments

110.   Defendants and the members of the cartel are competitors at the same level of competition that also plan to implement the Brave New World to protect themselves against competition from downgraded and other non-cartel tournaments, and to restrict competition among themselves.  Under the Brave New World, defendants have also agreed that they will boycott and refuse to deal with non-cartel tournaments except on terms that would consign those other tournaments to a perpetual "minor league" status, unable to compete against the cartel tournaments to produce top-tier events and attract top players, fans, sponsors, or media. Unless non-cartel tournaments agree to comply with the Brave New World, defendants will deprive those tournaments of access to the supply of top professional players whose participation is essential to the commercial and competitive success of any top-tier tournament.

111.   Because players are physically unable to play every week of the tennis season, they traditionally have chosen from among all tournaments (including the Davis Cup) the

limited number of events in which they are able to compete based on prize money, guarantees, prestige, convenience to other tournaments, playing surface, and other factors.

112.    But under the Brave New World, the mandatory requirement to play all eight Masters 1000 tournaments and the year-end Masters Cup (for the top eight players who qualify), in addition to the four Grand Slams (in which every player certainly will want to compete), will leave little opportunity for downgraded and lower-tier tournaments (limited to offering fewer ranking points and lower prize purses) to attract top players. This is particularly true for lower-tier tournaments that will be limited to one top-ten player and only two players ranked eleven to twenty in the ATP rankings, and even fewer if they are scheduled close in time to one of the mandatory or higher-sanctioned events. The player restrictions will thus make it virtually impossible for tournaments outside of the cartel to compete to attract the top players (or at best more than a very limited number of them).

113.    By comparison, mandatory participation in all Open 500 tournaments is not required; players are required to participate only in four of a possible eleven to fifteen tournaments, and only the point results from the four best tournaments count towards a player's ranking. The mandatory restraints placed on top players under the Brave New World plan reduce the likelihood that they will participate in greater numbers of Open 500 tournaments, rendering those events less attractive to sponsors and media, and less valuable to tournament owners. The ATP's own studies suggest that, in the Brave New World, on average only three of the top-ten tennis players are likely to participate in any given Open 500 event, while all of the top players are guaranteed to play in each Masters 1000 tournament. In fact, many top-ranked players have already begun to complain about the mandatory restraints and sanctions planned for the Brave New World, including Marat Safin, Andy Roddick, and James Blake. *See* Bill Scott,

*Blake, Roddick, Slam Sanctions Plan For ATP Absentees*, The Times (UK) (Mar. 10, 2007) ("'To make us play eight out of eight will be a very tough ask, especially all over the world,' said Blake. 'This all seems really harsh . . . .'"). These complaints confirm that it will be virtually impossible for downgraded tournaments and Open 500 tournaments to attract top-ranked players if defendants are permitted to implement their scheme to lock top players into participating in each and every cartel tournament.

114.    But if non-cartel tournaments refuse to accept the coercive terms of the Brave New World, defendants will enforce their unlawful boycott through rules that eliminate the ability of a non-sanctioned tournament to compete independently to produce a professional men's tennis event by restricting the supply of ATP's top-ranked professional players. Under a series of "special event" rules, the ATP precludes players from competing in non-sanctioned, non-ATP events that threaten to compete against ATP events in terms of timing or geography. For example, the ATP precludes a player from playing in a non-ATP "special event" that is scheduled within the calendar period of any ATP Masters Series tournament, International Series Gold Tournament, Tennis Masters Cup, or ATP World Doubles Championship, or within 30 days before or after such an ATP event if the "special event" is within a hundred miles of such ATP event or within the same market as that event. ATP Rule 1.16(A)(1). Other portions of the specific events rules impose similar geographic and temporal "black-out" periods around ATP International Series Tournaments and other ATP events.

115.    Given the market power the ATP exercises over the calendar for its sanctioned events, these rules make it virtually impossible for any independent tournament to attract enough top players to produce a top-tier tennis tournament within the traditional tennis season. The coercive use of player rules and calendar restrictions in the Brave New World to

create an unlawful horizontal boycott is unmistakable. Non-cartel tournaments must accept second-tier status on defendants' anticompetitive terms or defendants will refuse to do business with those tournaments at all, and without an ATP sanction, an "independent" tournament could never attract enough top players to produce a top-tier professional tennis tournament.

C.    **Horizontal Price-Fixing:  Caps and Limitations on Prize Money and Player Compensation**

116.    Under the Brave New World, defendants and members of the cartel have also conspired and agreed to fix prices for the services of top professional players with the purpose and effect of further restraining trade and enriching tournaments in the cartel. These rules mandate that tournaments may pay only the prize money authorized for its level of ATP sanction. Specifically, the new rules will cap the amount of prize money that certain tournaments can pay at a level well below the prize purses offered by Masters 1000 tournaments, and will preclude the lower-tier tournaments from offering any additional compensation in the form of player appearance fees or other prizes.

117.    By capping the amount of prize money and other compensation that certain tournaments may offer, the Brave New World effectively eliminates the ability of a downgraded or lower-tier tournament to compete against the Masters 1000 tournaments for players by offering more money than the top tournaments pay. In addition, because Masters 1000 tournaments will not have to worry about pressure to increase their prize purses from lower-tier tournaments, the price caps artificially limit the amount of money that players can earn at all tiers of tournament competition. As a result of this price-fixing scheme, the ATP and cartel tournaments are protected from price competition and enriched, while players, non-cartel tournaments, and competition itself are harmed and diminished.

**D.    Horizontal Conspiracy and Agreement to Divide and Allocate Markets:
Manipulation of Sanctions Bid Process and Tournament Scheduling**

118.    Defendants and members of the cartel have further conspired and agreed
as horizontal competitors to restrain trade and divide and allocate markets among them to
eliminate competition from non-cartel tournaments, and among each other, in at least two ways.
First, defendants and members of the cartel have conspired and agreed to award the reduced
number of Masters 1000 sanctions to favored tournaments in the cartel without a true
competitive bidding process or proper consideration of such competitive criteria as location,
attendance, facility amenities, prize money, sponsorships, tradition and prestige, local
accommodations for spectators and players, ratings for television and other media, and consumer
and player preference.

119.    At its January 2007 meeting, for example, defendants "agreed that the
Chinese sanction would be subject to a matter of negotiation and not an open application." In
March 2007, the ATP effectuated its agreement to divide geographic markets for top-tier
tournaments by awarding a Masters 1000 sanction to the organizers of the Shanghai tournament,
and to reduce the number of Masters 1000 tournaments in Europe as a result, based on the
payment of a substantial fee to the ATP by the Chinese tournament, rather than on the
competitive merits. But for the payment of that substantial fee and the anticompetitive restraints
imposed by the Brave New World, the Shanghai tournament would not be able to compete on the
merits to attract top players over the European tournaments that are to be downgraded, because
many players would not otherwise choose to travel to compete in Asia.

120.    Upon information and belief, favored tournaments that "meet" the
"minimum criteria" described in the applications for Masters 1000 sanctions in the Brave New
World may be required or expected to make similar financial payments to the ATP itself in order

to obtain a Masters 1000 sanction. This allocation of top-tier tournament status based on financial payments makes a mockery of the so-called "open-bidding" process while enriching the ATP and certain of its officers at the expense of investments that could have been made to improve the quality of the tournaments or to attract players.

121.    Second, defendants have manipulated the tournament schedule to allocate prime calendar dates to top-tier tournaments in the cartel. These decisions shield the favored tournaments against geographic and calendar competition from downgraded or lower-tier tournaments that have been assigned less-desirable locations or dates, or deprived of their traditional dates on the calendar.

122.    In awarding a top-tier sanction to China in exchange for a large financial payment and without competitive bidding, for example, the ATP decided to schedule that tournament after the U.S. Open in the period currently occupied by the Masters Series Madrid tournament. The ATP then rescheduled the Madrid tournament to dates within the run-up to the French Open during which Rome, Hamburg, and Monte-Carlo have traditionally hosted their tournaments.

123.    By downgrading Monte-Carlo and Hamburg and moving the Madrid tournament into their traditional season, defendants and members of the cartel effectively have divided the market among themselves and guaranteed calendar and geographic protections to tournaments in the cartel. There is no reason why the Madrid tournament could not host a combined or men's only Masters event within its current calendar position, except that defendants have conspired and agreed to divide and allocate the market to favor tournaments within the cartel. Defendants' steps to implement the Brave New World will foreclose Monte-

Carlo from competing on its merits with the other Masters 1000 tournaments to produce a successful top-tier tournament.

E.  **Horizontal Conspiracy and Agreement to Unreasonably Restrain Trade: Pooling Media Rights**

124.    Defendants and members of the cartel have further conspired and agreed to pool the television and new media broadcast rights to Masters 1000 tournaments in the Brave New World while excluding downgraded tournaments. These pooled rights will be controlled and administered by the recently formed ATP Media, and the ATP itself stands to gain financially from these transactions through increased marketing payments and other fees extracted from the Masters 1000 tournaments, and through an increased portion of the pooled revenues retained by the ATP.

125.    The new pooling arrangements will thus enrich the ATP and cartel tournaments, while severely diminishing the ability of downgraded and other lower-tier tournaments to expand their audiences and compete for television and media coverage. Because the ATP will offer the pooled television rights as a package, television and media outlets that contract with the cartel will be required to broadcast coverage or footage from all eight Masters 1000 tournaments, even if those broadcasters would prefer not to air certain Masters 1000 tournaments, or would prefer to broadcast non-cartel tournaments. As a result, Monte-Carlo and other lower-tier tournaments will have less of a market for their competing broadcast rights packages, particularly in the United States.

126.    If downgraded, Monte-Carlo will also lose revenue it currently receives under agreements to pool its broadcast rights with the other current top-tier tournaments. The Brave New World will exclude Monte-Carlo from fairly competing for television coverage in the United States and around the world and deprive it of the corresponding revenues, ratings, and

audience needed to maintain a successful top-tier event, thus further diminishing the visibility of its tournament and the value of its associated broadcast and media rights.

### HARM TO MONTE-CARLO

127.    As alleged above, Monte-Carlo will suffer direct competitive harm if the Brave New World is implemented.  If downgraded, Monte-Carlo will be relegated to second-tier Open 500 status or worse, deprived of its natural ability, shown over many years, to compete fairly and on the merits for the top tennis players, premium sponsors, world-wide media, and global audience necessary to challenge the top-tier status of the Masters 1000 tournaments. Monte-Carlo will suffer substantial loss of value, prestige, reputation, and goodwill accumulated over nearly one-hundred years of successful competition on the merits as a result.  In the absence of defendants' unlawful scheme, Monte-Carlo would have the resources and commercial acumen to continue competing for top players, premium sponsors, lucrative broadcasting deals, and the broader audience of tennis fans and consumers.

128.    If implemented, the Brave New World will confront Monte-Carlo with two unacceptable anticompetitive options.  It could accept its predetermined, downgraded status as a second-tier or lower tournament, or withdraw from the ATP and try to compete as an independent tournament.  Neither choice would permit Monte-Carlo to compete fairly to maintain its status as a top-tier tournament, because the ATP's market power and unreasonable restraints on players and other anticompetitive provisions will make that impossible.

129.    If Monte-Carlo remains in the Brave New World and is downgraded, for example, it could never compete to maintain or recover its top-tier status.  The sanctions for the reduced number of eight Masters 1000 tournaments will be guaranteed for a period of ten years or even longer.  The mandatory player commitment requirements and drastic penalties in the Brave New World will prevent Monte-Carlo from attracting the number of high caliber players

needed to stage a top-tier event. Players will be obligated to play all eight of the eight Masters 1000 tournaments on pain of reduced bonuses, zero ranking points, and suspensions, and Monte-Carlo's reduced number of available ranking points will make it far less attractive to top players. Indeed, the ATP's own documents show that Open 500 tournaments on average are not likely to attract more than three of the top-ten players to their tournaments.

130.    If Monte-Carlo were to compete as an independent tournament, the ATP's dominance and control of the supply of professional players, and its ability to manipulate the ATP tournament calendar to move mandatory or other tournaments into time positions that compete with Monte-Carlo, would effectively eliminate any ability to attract premium players and maintain top-tier status. The ATP's "special events" rules, mandatory player restrictions, and control of the calendar effectively gives the ATP a "veto" power over the decision of any top player who might prefer to compete in a Monte-Carlo tournament that competed at or close in time to an ATP-sanctioned event. Either way, Monte-Carlo could not compete on a level-playing field to attract the top players, sponsors, media, and fans necessary to produce a top-tier tennis tournament.

131.    As alleged above, Monte-Carlo's claims and injuries arise from, depend upon, and are inextricably intertwined with the direct, substantial, reasonably foreseeable, and harmful effects of defendants' anticompetitive conduct on domestic trade and commerce in the United States, including harm that will be caused by Monte-Carlo's inability to compete for broadcast rights and revenues from television networks and other media outlets in the United States, for the services of professional tennis players in the United States, and for the audience of tennis fans in the United States.

## ANTITRUST STANDING

132.    Monte-Carlo is a proper party to seek redress under Sections 4 and 16 of

the Clayton Act, 15 U.S.C. §§ 15 and 26, because it is a competitor or potential competitor in

certain of the relevant markets, and a customer and potential customer of services in certain of

the other relevant markets, that have been restrained and monopolized, and Monte-Carlo has

suffered direct antitrust injury.  There is no potential for duplicative recovery or an

apportionment of damages, nor a more direct victim of the challenged conduct that is likely seek

redress for the violations.  There is a direct, causal relationship between the challenged conduct

and Monte-Carlo's injuries, and those injuries are neither tenuous nor speculative.  Absent

defendants' anticompetitive scheme to restrain trade and monopolize the market, Monte-Carlo

could continue to maintain the top-tier status of its professional men's tennis tournament by

competing to attract top tennis players, sponsors, media, and consumers for men's tennis

tournaments.

## EFFECT ON INTERSTATE COMMERCE

133.    Defendants' anticompetitive conduct as alleged herein has taken place in

interstate commerce and has restrained trade and commerce among the States and in the markets

identified, and will continue to do so in the future.

### FIRST CLAIM FOR RELIEF
### (Sherman Act, Section 1, 15 U.S.C. § 1 –
### Contract, Combination, or Conspiracy in Restraint of Trade)

134.    Monte-Carlo repeats and realleges the allegations contained in the

paragraphs 1 through 133 as if fully set forth herein.

135.    The ATP and certain of its member tournaments are horizontal

competitors and independent legal entities engaged in an ongoing conspiracy, contract, or

combination, among themselves and with certain of their directors and officers, the primary

object of which is to unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

136.    As alleged herein, defendants' Brave New World scheme, if implemented, will unreasonably restrain trade by:

(a)    limiting output in the relevant markets by reducing the number of top-tier professional men's tennis tournaments;

(b)    restraining and eliminating competition among tournaments for the services of top tennis players by imposing mandatory player restrictions and penalties that drastically reduce players' ability to participate in tournaments excluded from the unlawful cartel;

(c)    fixing prices by capping the amount of prize money and other compensation that certain tournaments may offer to compete for the services of top players;

(d)    dividing and allocating markets for tournaments by manipulating the bidding process for awarding top-tier tournament sanctions and manipulating tournament schedules with respect to geographic location and calendar dates to favor members of the cartel;

(e)    pooling television and media rights to cartel tournaments to obtain supra-competitive profits from the sale of those rights, while restraining the ability of non-cartel tournaments to compete fairly with the cartel broadcasts; and

(f)     boycotting potential competitors and players by collectively refusing to

deal with qualified tournaments and players that do not meet or abide by

the coercive terms of the cartel's unlawful scheme.

137.    Defendants' anticompetitive conduct have had a significant adverse effect

on competition in the relevant markets related to the production and staging of professional

men's tennis tournaments, causing direct and proximate harm to consumers and market

participants as described above.

138.    The anticompetitive actions of defendants have directly injured Monte-

Carlo in its business and property.  Monte-Carlo's injuries and damages are ongoing and will

continue unless a permanent injunction is granted.

## SECOND CLAIM FOR RELIEF
### (Sherman Act, Section 2, 15 U.S.C. § 2 – Monopolization)

139.    Monte-Carlo repeats and realleges the allegations contained in the

paragraphs 1 through 138 as if fully set forth herein.

140.    The ATP has monopoly power in the relevant markets related to the

production and staging of professional men's tennis tournaments by virtue of its near-total

control of all tournament sanctioning, scheduling, rule-making, standard-setting, and player

rankings and restrictions related to professional men's tennis tournaments.

141.    The ATP is maintaining and enhancing that monopoly power through the

predatory and exclusionary acts described above in connection with the implementation of the

Brave New World scheme, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

142.    Defendants' predatory and exclusionary conduct has had and will have a

significant adverse effect on competition in the relevant markets related to the production and

staging of professional men's tennis tournaments, causing direct and proximate harm to consumers and market participants as described above.

143.    The predatory and exclusionary actions of defendants have directly injured Monte-Carlo in its business and property.  Monte-Carlo's injuries and damages are ongoing and will continue unless a permanent injunction is granted.

## THIRD CLAIM FOR RELIEF
### (Sherman Act, Section 2, 15 U.S.C. § 2 – Conspiracy to Monopolize)

144.    Monte-Carlo repeats and realleges the allegations contained in the paragraphs 1 through 143 as if fully set forth herein.

145.    As alleged above, the ATP and certain of its member tournaments are horizontal competitors and independent legal entities engaged in an ongoing conspiracy, contract, or combination to implement the Brave New World plan that constitutes concerted action for purposes of defendants' conspiracy to monopolize.

146.    The actions described above constitute overt acts in furtherance of defendants' agreement and conspiracy to monopolize the relevant markets.

147.    Defendants have taken the concerted actions described above with the specific intent to monopolize the relevant markets related to the production and staging of professional men's tennis tournaments, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

148.    Defendants' concerted actions in furtherance of their conspiracy to monopolize have had and will have a significant adverse effect on competition in the relevant markets related to the production and staging of professional men's tennis tournaments, causing direct and proximate harm to consumers and market participants as described above.

149.    The anticompetitive actions of defendants have directly injured Monte-Carlo in its business and property.  Monte-Carlo's injuries and damages are ongoing and will continue unless a permanent injunction is granted.

### FOURTH CLAIM FOR RELIEF
**(Sherman Act, Section 2, 15 U.S.C. § 2 – Attempted Monopolization)**

150.    Monte-Carlo repeats and realleges the allegations contained in the paragraphs 1 through 149 as if fully set forth herein.

151.    Through the actions described above, defendants have engaged in anticompetitive and exclusionary conduct in an attempt to monopolize the relevant markets related to the production and staging of men's professional tennis tournaments, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

152.    Defendants have engaged in the anticompetitive and exclusionary acts described above with the specific intent to monopolize the market, and there is a dangerous probability that defendants will succeed in their attempt to monopolize if the Brave New World is implemented by virtue of the ATP's market power, barriers to entry, and the other factors described above.

153.    Defendants' anticompetitive and exclusionary conduct has had and will have a significant adverse effect on competition in the relevant markets related to the production and staging of professional men's tennis tournaments, causing direct and proximate harm to consumers and market participants as described above.

154.    The anticompetitive and exclusionary actions of defendants have directly injured Monte-Carlo in its business and property.  Monte-Carlo's injuries and damages are ongoing and will continue unless a permanent injunction is granted.

## FIFTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duties Against the Individual Defendants)

155.    Monte-Carlo repeats and realleges the allegations contained in the paragraphs 1 through 154 as if fully set forth herein.

156.    The directors and officers of the ATP owe fiduciary duties to the ATP and its members, including Monte-Carlo. These duties require such directors and officers to at all times serve the best interests of the ATP and its members, to not place their personal interests above those of the ATP and its members, and to discharge their duties in good faith and with the diligence, care, and skill of an ordinary prudent person under similar circumstances.

157.    The Individual Defendants have breached their fiduciary duties to the ATP and its members because, as described in detail above, they have put their own interests ahead of the ATP's and its members and have failed to discharge their duties in good faith.

158.    By seeking to change the structure of the top-tier men's professional tennis tournaments to benefit certain favored tournaments and their own personal interests at the expense of other member tournaments, the Individual Defendants do not intend and will not promote and protect the future of tennis. Rather, the changes will destroy competition in the market and harm existing, successful member tournaments, such as Monte-Carlo. The Individual Defendants thus have failed to act in the best interests of the ATP and its member tournaments and failed to promote the very objective that the ATP was created to achieve.

159.    In addition, by voting to implement a restructuring plan that is anticompetitive and in clear violation of the antitrust laws, the Individual Defendants, as well as the other ATP directors who voted in favor of the plan but who are not named as defendants, failed to discharge their duties with the diligence, care and skill of an ordinary prudent person under the circumstances.

160.    As a result of their breach of their fiduciary duties, the Individual Defendants have directly injured Monte-Carlo in its business and property.  Monte-Carlo's injuries and damages are ongoing and will continue unless a permanent injunction is granted.

### PRAYER FOR RELIEF

WHEREFORE, Monte-Carlo respectfully prays that this Court:

A.    Preliminarily and permanently enjoin the ATP and Individual Defendants from directly or indirectly implementing the Brave New World plan and from engaging in any of the unlawful and anticompetitive conduct alleged herein;

B.    Issue a declaratory judgment that defendants' Brave New World plan is unlawful in violation of Sections 1 and 2 of the Sherman Act and the common law;

C.    Award damages in an amount to be proven at trial, to be trebled pursuant to 15 U.S.C. § 15(a), against defendants for their violations of the Sherman Act, 15 U.S.C. §§ 1 and 2;

D.    Award damages in an amount to be proven at trial against the Individual Defendants for their violations of their fiduciary duties to Monte-Carlo;

E.    Award punitive damages in an amount to be proven at trial against the Individual Defendants for their violations of their fiduciary duties to Monte-Carlo;

F.    Issue a declaratory judgment that the Individual Defendants are not entitled to indemnification under the ATP Bylaws or 8 Del. Code § 145 for any monetary judgment entered against the Individual Defendants or for any legal fees or costs incurred by the Individual Defendants in connection with the defense of this action;

G.    Award the costs of this action, including reasonable attorneys' fees as allowed for violations of the Sherman Act, to Monte-Carlo pursuant to 15 U.S.C. § 15(a); and

H.    Order such other and further relief as the Court deems just and proper.


POTTER ANDERSON & CORROON LLP


By: _____
Philip A. Rovner (#3215)
Hercules Plaza
P.O. Box 951
Wilmington, Delaware 19899
(302) 984-6000
provner@potteranderson.com

SIDLEY AUSTIN LLP
Alan M. Unger
John J. Lavelle
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

Attorneys for Plaintiffs
Monte-Carlo Country Club and Société
Monégasque pour L'Exploitation du
Tournoi de Tennis

Dated:   April 9, 2007
788012

JS 44  (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

MONTE-CARLO COUNTRY CLUB  and  SOCIÉTÉ MONÉGASQUE POUR L'EXPLOITATION DU TOURNOI DE TENNIS

**DEFENDANTS**

ATP TOUR, INC., ETIENNE DE VILLIERS, and CHARLES PASARELL

(b) County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

Philip A. Rovner, Esq. (#3215)
Potter Anderson & Corroon LLP
P.O. Box 951, Wilmington, DE  19899  (302) 984-6000

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1  U.S. Government Plaintiff
- [x] 3  Federal Question (U.S. Government Not a Party)
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated or Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability

### TORTS
**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury

**PERSONAL INJURY**
- [ ] 362 Personal Injury— Med. Malpractice
- [ ] 365 Personal Injury— Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### FORFEITURE/PENALTY
- [ ] 610 Agriculture
- [ ] 620 Other Food & Drug
- [ ] 625 Drug Related Seizure of Property 21 USC
- [ ] 630 Liquor Laws
- [ ] 640 R.R. & Truck
- [ ] 650 Airline Regs.
- [ ] 660 Occupational Safety/Health
- [ ] 690 Other

### LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Mgmt. Relations
- [ ] 730 Labor/Mgmt. Reporting & Disclosure Act
- [ ] 740 Railway Labor Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 840 Trademark

### SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

### FEDERAL TAX SUITS
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- [ ] 400 State Reapportionment
- [x] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce/ICC Rates/etc.
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 810 Selective Service
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 875 Customer Challenge 12 USC 3410
- [ ] 891 Agricultural Acts
- [ ] 892 Economic Stabilization Act
- [ ] 893 Environmental Matters
- [ ] 894 Energy Allocation Act
- [ ] 895 Freedom of Information Act
- [ ] 900 Appeal of Fee Determination Under Equal Access to Justice
- [ ] 950 Constitutionality of State Statutes
- [ ] 890 Other Statutory Actions

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### CIVIL RIGHTS
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 444 Welfare
- [ ] 440 Other Civil Rights

### PRISONER PETITIONS
- [ ] 510 Motions to Vacate Sentence
  Habeas Corpus:
- [ ] 530 General
- [ ] 535 Death Penalty
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- [x] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from another district (specify)
- [ ] 6  Multidistrict Litigation
- [ ] 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Antitrust causes of action under 15 U.S.C. Sections 1 and 2 and breach of fiduciary duty

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:  [x] Yes  [ ] No

## VIII. RELATED CASE(S) IF ANY
(See instructions):

JUDGE  Gregory M. Sleet

DOCKET NUMBER  07-178

DATE  4-9-07

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

JS 44 Reverse (Rev. 12/96)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44

Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.      **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

       (b.) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

       (c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.     **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States, are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.    **Residence (citizenship) of Principal Parties.** This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.     **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.      **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a) Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

VI.     **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause.

VII.    **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.   **Related Cases.** This section of the JS-44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _0 7 ⁻ 1 9 8_____

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE
2007 APR -9 AM 8: 41

## ACKNOWLEDGMENT
## OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF ___2___ COPIES OF AO FORM 85.

APR 0 9 2007
_____
(Date forms issued)

_Shane Handlin_
_____
(Signature of Party or their Representative)

___Shane Handlin___
_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action